UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| AVONDA URBEN, on behalf of herself and in her capacity as the Sellers' Representative, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:23-cv-00138-TSE-IDD |
| v. | ) ) ) | |
| GRIDKOR, LLC, MICHAEL BRYANT, KORDEV, LLC, and ALYSSA SCHRECENGOST BRYANT, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| GRIDKOR, LLC, | ) ) ) | |
| Counterclaim and Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| AVONDA URBEN; JOHN DOE NOS. 1-5; and JANE DOE NOS. 1-5, | ) ) ) ) | |
| Counterclaim and/or Third-Party Defendants | ) ) ) | |

**REPLY IN SUPPORT OF KORDEV LLC, MICHAEL BRYANT AND ALYSSA BRYANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Plaintiff seeks to hold Defendants Michael Bryant, Alyssa S. Bryant, and KorDev LLC (collectively, "the Movants") liable, under an alter ego theory of liability, for alleged breaches of a Stock Purchase Agreement (First Cause of Action) and the implied covenant of good faith and fair dealing thereunder (Third Cause of Action) *by Defendant GridKor, LLC*. In sum, Plaintiff alleges GridKor breached the Stock Purchase Agreement by "shutting down" the company it

acquired from Plaintiff and the unnamed Sellers, The Perfect V Enterprises, Inc. ("PVE"), and she now seeks to hold all four defendants liable for both for GridKor's alleged breaches and for fraudulently inducing her to enter into the agreement (Second Cause of Action), apparently based both on their own personal statements and/or actions and as alter egos of GridKor.

Contrary to Plaintiff's assertions, GridKor did not "shut down" PVE, but instead was rendered unable to operate the business in any meaningful way as a result of *Plaintiff's* repeated and inexplicable failure to perform under the Stock Purchase Agreement by delivering and/or turning over access to and control of PVE's property, accounts, records, information and log in credentials, ultimately forcing GridKor to rescind the deal and return PVE to Plaintiff. The underlying merits of Plaintiff's claims will be dealt with soon enough, but the present Motion (*see* Docs. 22 & 23) is addressed only to (1) Plaintiff's alter ego claims, *i.e.*, the First and Third Causes of Action in their entirety as against Movants and the Second Cause of Action for fraudulent inducement to the extent it is premised on an alter ego theory, and (2) all claims (of any kind) against Alyssa S. Bryant.

Plaintiff acknowledges her alter ego claims must comply with the heightened pleading standard of Rule 9(b) (Doc. 34, hereinafter "Opposition" or "Opp'n," at 7), but despite two attempts she has failed to muster anything beyond unsupported conclusory allegations. Plaintiff's allegations are worlds away from the level of specificity and particularity required to state a claim under an alter ego theory. Moreover, in an affidavit submitted with her Opposition Plaintiff admits she does not know whether any such facts even exist, but instead hopes to "pursue discovery to determine the truth or falsity" of Mr. Bryant's statements and the business structure, activities, capitalization, solvency, corporate formalities, ownership and control of GridKor and KorDev.

2

(*See* Doc. 34-1 ¶¶ 7 & 9.) Either Plaintiff can state a claim or not, and she plainly cannot. She is not entitled to an opportunity to conduct discovery to see if she might be able to state a clam.

The First Amended Complaint does at least allege (albeit inaccurately) false statements by Michael Bryant and KorDev,[1] therefore, we do not seek dismissal of the Second Cause of Action altogether as to those Defendants, just to the extent it is premised on an alter ego theory. Movants do, however, ask that the Court dismiss the fraudulent inducement claim in its entirety as against Alyssa S. Bryant because the First Amended Complaint does not allege that she made *any statements or representations*, false or otherwise, and therefore does not state even a plausible claim for fraudulent inducement against Mrs. Bryant based upon her own conduct, much less a claim pled with the requisite particularity. In her Opposition, Plaintiff makes no attempt to justify her claims against Mrs. Bryant or explain how the claims against her meet any pleading standard, and they do not. Accordingly, all claims against Mrs. Bryant should be dismissed.

## ARGUMENT

**I.       Plaintiff Has Failed to Allege with Particularity a Claim for Alter Ego Liability**

To sufficiently plead a claim for piercing the corporate veil or imposing alter ego liability, a plaintiff must allege facts supporting two elements: (1) that the corporation and its shareholders did not operate as legally distinct entities, and (2) that there has been an element of fraud, injustice or inequity in the use of the corporate form. *See, e.g., Fidelity Nat'l Info. Servs., Inc. v. Piano*

---

[1] Plaintiff devotes an entire section of her brief to opposing a motion that has not been made, *i.e.*, to dismiss the fraudulent inducement claim as against Mr. Bryant to the extent it is premised on his own statements. (Opp'n at 13-14.) The instant motion does not contend that Mr. Bryant cannot be personally liable in tort based upon his own conduct, only that he cannot be held liable for the conduct of another based upon an alter ego theory that is not sufficiently alleged. We note Plaintiff's allegations against Mr. Bryant are wholly without merit, at least in part because she attributes things to Mr. Bryant that he did not say or references things that he did say which were absolutely true. With respect to Mr. Bryant though, the present motion is directed only to the alter ego claims, which fail on their face.

*Encryption Techs., LLC*, Civil Action No. 15-777-LPS, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016) (citing cases).  Plaintiff has not stated a plausible claim under either element, much less pled such a claim with the requisite particularity.

> A. **Plaintiff Has Not Alleged with Particularity Misuse or Disregard of the Corporate Structure**

Plaintiff contends her First Amended Complaint "pleads facts relating to the [ ] factors for piercing the corporate veil" (Opp'n at 8), but she is unable to cite to anything other than conclusory assertions, and even those conclusory allegations she does make have no bearing on any of the actual factors relevant to the first element of a veil-piercing claim.

Plaintiff first argues she has sufficiently alleged "GridKor and KorDev fail to observe corporate formalities" by alleging that they "share the same registered agent and mailing addresses" and "share employees, contractors, managers, and officers, and use email addresses interchangeably[.]" (Opp'n at 8.) *First*, the First Amended Complaint alleges all of this in completely conclusory fashion. (*See* Doc. 15 ¶ 14.) *Second*, even if true (and much of it misapprehends or mischaracterizes the facts) and even if any specificity were provided, none of this is the kind of thing that moves the needle on any of the five factors. This says nothing about whether GridKor was adequately capitalized. It gives no indication whether GridKor was solvent. None of this indicates that GridKor did not observe corporate formalities, that the dominant shareholder siphoned GridKor funds, nor that GridKor simply functioned as a façade for the dominant shareholder.

Tellingly, Plaintiff does not cite to any case law or other authority recognizing the use of the same registered agent, vendors, mailing addresses, email addresses or having overlapping ownership, officers, directors or employees as bearing in any significant way on any of the five factors considered in determining whether there has been an abuse of the corporate form. In fact,

4

"Delaware courts have upheld the legal significance of corporate form, in a corporate-subsidiary complex, despite the fact of substantial overlap in the management and control of the two entities." *Principal Growth Strategies, LLC v. AGH Parent LLC*, 288 A.3d 1138, 1162 (Del. Ch. 2023) (quoting *Leslie v. Telephonics Off. Tech., Inc.*, 1993 WL 547188, at *8 & n.13 (Dec. 30, 1993) (collecting cases)). That the parent company and subsidiary "are intimately related in carrying on their business for the purpose of mutual benefit is not enough to characterize a corporation as the alter ego of the other corporation." *In re Washington Mut. Inc.*, 741 F. App'x 88, 92 (3d Cir. 2018) (quoting *In re Wade Cook Fin. Corp.*, 375 B.R. 580, 599 (B.A.P. 9th Cir. 2007)). Courts thus have dismissed for failure to state a claim alter ego or veil-piercing claims premised on allegations of overlapping control or management, use of shared physical and email addresses, and even common business purpose or ethos. *See, e.g.*, *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544-49 (4th Cir. 2013) (holding alter ego claims properly dismissed for failure to state a claim despite allegations of, *inter alia*, shared business address, common office space, and shared email accounts and phone numbers); *Wenske v. Blue Bell Creameries, Inc.*, No. CV 2017-0699-JRS, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018) ("A parent corporation is not liable for the acts of its subsidiary merely because it owns (and votes) a majority of the subsidiary's stock or shares common shareholders, directors or officers with the subsidiary. Nor will conclusory allegations that the parent's management exclusively dominated and controlled the subsidiary's management suffice to state a claim for veil-piercing."); *Pontiaki Special Maritime Enter. v. Taleveras Grp.*, Civ. No. 16-247-LPS, 2016 WL 4497058 at *4-5 (D. Del. Aug. 26, 2016) (recognizing that commonalities in ownership, branding, trademarks, and Internet domains "alone are insufficient to pierce the corporate veil"); *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1044 (Del. Ch. 2006) (reiterating "corporations have, as a presumptive matter, a separate legal existence

5

irrespective of their common control"). Indeed, Delaware corporation law "is largely built on the idea that the separate legal existence of corporate entities should be respected—*even when those separate corporate entities are under common ownership and control*." *Principal Growth*, 288 A.3d at 1162 (emphasis added).

Plaintiff also claims she has alleged "that Bryant uses the companies he controls interchangeably" (Opp'n at 8-9), citing to a lawsuit filed by KorDev which the First Amended Complaint describes as acknowledging "that consideration for the purchase of a company in which Bryant held an ownership interest would be paid solely by entering into an exclusive consulting agreement with KorDev." (Doc. 15 ¶ 15.) *First*, none of this has anything to do with GridKor. Whatever the particulars of it may be, a separate transaction to which KorDev, a 34 percent owner of GridKor, was a party does not provide any factual basis for alleging that *GridKor* failed to observe corporate formalities or abused its corporate form in any way. *Second*, there is nothing unusual or dubious about a business owner selling a company he owns in exchange for something other than an immediate cash payment. A consulting arrangement, a vendor relationship, or any other manner of contractual commitment by the seller can serve as consideration just as readily as cash. Plaintiff cites no authority for the notion that a transaction of such unremarkable nature, not even involving the entity whose veil is sought to be pierced, even suggests, much less supports, an alter ego claim.

Plaintiff also points to her conclusory allegations that the Bryants "siphoned the business funds [of PVE] for personal purposes, and/or [they] have commingled personal and corporate funds." (Doc. 15 ¶ 13.) The only specifics provided to support these conclusory allegations are Plaintiff's characterization of her and the Bryants' visits on December 8, 2022, to the two banks where PVE had its accounts. (*See id.* ¶¶ 13, 61 & 62.) While incomplete in several respects, those

6

allegations do not add any particularity, or even plausibility, to Plaintiff's conclusory accusations of siphoning and co-mingling.  Plaintiff alleges she had "tried to transfer the existing accounts remotely" but TD Bank "required the new owner's physical presence," causing Mr. Bryant to have to travel to Virginia.  (Doc. 15 ¶ 61.)  Mr. Bryant did so (accompanied by his wife) on December 8, 2022, but, according to Plaintiff's allegations:

> … instead of transferring the accounts to GridKor, or creating new accounts for the Company, Bryant and Alyssa closed the accounts and withdrew the entirety of the Company's funds in cash – approximately $10,000 in $100 bills.  Bryant introduced Alyssa to the banking representative and to Urben as the owner of the Company, and stated that Alyssa would be responsible for signing relevant paperwork as owner of GridKor.

(Doc. 15 ¶ 62.)  All that Plaintiff alleges is that the Bryants withdrew PVE's funds in cash acting as the owner(s) of PVE and/or GridKor.  Plaintiff does not allege (even in conclusory fashion) that the Bryants then used the money for personal expenditures or that they co-mingled those funds with their personal funds or the funds of any other entity.  Instead, she attempts to create the suggestion or inference of such from the fact of the cash withdrawal.  But the mere fact of a cash withdrawal is fathoms removed from co-mingling or siphoning of funds.  That is especially so where, in fact, *it was Plaintiff herself* who gave rise to the circumstances necessitating the cash withdrawal that she now seeks to spin into something nefarious.[2]

---

[2] While the Court must rule based on the allegations in her pleading, we note that Plaintiff's description of the events of December 8, 2022 is materially incomplete and misleading.  The entire purpose of the trip was to remove Ms. Urben as an authorized person on what she represented were PVE's two bank accounts, one at TD Bank and one at Chase Bank, and add a new authorized person in her place.  In the middle of completing the paperwork to do this, the manager at TD Bank requested Ms. Urben provide a password or code for the account so as to confirm her identity and authority.  She was unable to do so, claiming she had forgotten.  The manager stated he could not remove Ms. Urben from the account without the code, but he could close the account.  Rather than make a second trip, Mr. Bryant elected to proceed in that fashion.  The manager asked if he would accept cash and Mr. Bryant said yes.  Ms. Urben claimed to also not have her password or code for the Chase Bank account, so Mr. Bryant did not even attempt to remove her from that account and instead asked Ms. Urben to close the account as she had the TD Bank one.  (*See* GridKor's Answer, Doc. 26 ¶ 62.)

7

Finally, Plaintiff claims she has alleged "Bryant and KorDev exercise such control over GridKor so as to make it a complete façade" and that "Bryant, as sole owner of KorDev, dominates and controls GridKor such that Bryant and KorDev are mere alter egos of GridKor." (Opp'n at 9.) But this too is pled only in conclusory fashion. The only detailed allegations Plaintiff points to in support of these assertions are her allegations regarding the negotiations and discussions leading up to the execution of the Stock Purchase Agreement and that Mr. Bryant was involved in those communications, initially, according to Plaintiff, on behalf of KorDev and later on behalf of GridKor. (*See* Opp'n at 9-10.) That Mr. Bryant, the President of GridKor, was involved in the discussions leading up to the Stock Purchase Agreement is wholly unremarkable. Even if Plaintiff alleges Mr. Bryant made false statements in the course of those discussions (which he did not), that does not make out a particularized allegation of an abuse of the corporate form. *See Doberstein v. G-P Indus., Inc.*, No. CV 9995-VCP, 2015 WL 6606484, at \*4-5 (Del. Ch. Oct. 30, 2015) (holding allegations company's president "repeatedly communicated false statements to [plaintiff] concerning the work being done" and that he "increased the frequency and the amount of [the company's] billing during the last six weeks of the Project, despite the fact that they knew they shortly were going to abandon it and cease doing business" were insufficient to state veil-piercing claim against president).

In any event, "[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity." *Principal Growth*, 288 A.3d at 1162 (quoting *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978)). Plaintiff thus does not even plausibly allege that either the Bryants or KorDev are the alter ego of GridKor. The First Amended Complaint contains nothing but conclusory allegations, unreasonable suggested inferences, or threadbare recitals of the elements of alter ego that need not be accepted

8

as true. "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc. v. Acacia Rsch. Corp.*, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010).

### B. Plaintiff Has Not Alleged with Particularity that GridKor's Corporate Structure Caused a Fraud

Even if Plaintiff had sufficiently alleged misuse of the corporate form (which she has not), Plaintiff must also allege with particularity that it was the misuse of the corporate form itself that caused the alleged fraud or injustice. Plaintiff contends her complaint adequately pleads "that the Moving Defendants used GridKor to commit a fraud and injustice" because she alleges "Bryant represented that KorDev would serve as the purchaser in the SPA before switching KorDev out for GridKor" and "Bryant misrepresented that GridKor was the parent company of KorDev" (Opp'n at 11). This makes no sense, and does not have the kind of connection to the use of the corporate form that the law requires in any event.

"[W]hile any party that brings a legal claim (e.g., for breach of contract, or in tort) against a purported alter ego company can assert that an 'injustice' is being done to them (e.g., based on the facts that give rise to their claim for breach of contract, or their tort claim), that is not the kind of 'injustice' that is relevant." *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018). "Instead, Delaware law requires that the fraud or injustice be found in the defendant's use of the corporate form itself." *Id.* at 620 (emphasis omitted); *see also EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) ("[T]he requisite element of fraud under the alter ego theory must come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim.").

9

The First Amended Complaint is devoid of any such allegation. Instead, Plaintiff merely alleges she and Mr. Bryant initially discussed a transaction with KorDev, but GridKor ultimately became the contractual counterparty. Plaintiff does not allege this was hidden from her, but expressly alleges that GridKor was identified as the counterparty well before the execution of the Stock Purchase Agreement and that GridKor itself made various representations and Mr. Bryant made representations about GridKor. (*See* Doc. 15 ¶¶ 35-41, 43-47, 52-53.) According to Plaintiff, however, the "fraud" was in Mr. Bryant's alleged misrepresentation "that GridKor was the parent company of KorDev" and his alleged "suggest[ion] that there were even greater assets and wherewithal at the parent level." (*See* Doc. 15 ¶ 50; Opp'n at 11-12.) But Plaintiff alleges in the same paragraph that she *does not know* how GridKor's assets compare to KorDev's. (Doc. 15 ¶ 50 ("it is unclear what assets, if any, do in fact reside at the GridKor subsidiary level").) As such, Plaintiff cannot even allege that the alleged "fraud" negatively impacted her.

Further, Plaintiff's attempt to turn Mr. Bryant's alleged mischaracterization of the relationship between GridKor and KorDev into a fraud fails for the additional reason that, if the true facts were as Mr. Bryant allegedly represented them to be (*i.e.*, that GridKor was the parent of KorDev), *then Plaintiff's task would be even more difficult*. For all of the reasons set forth previously, Plaintiff cannot state a claim for KorDev (a 34 percent owner of GridKor) to be held liable as an alter ego of GridKor. But it would be even more difficult for Plaintiff to hold GridKor (a subsidiary) liable for the alleged obligations of KorDev (the parent) because that would involve *reverse* veil-piercing (*i.e.*, holding a subsidiary liable for the debts of the parent or the company liable for the debts of the shareholder). In addition to the traditional alter ego factors, such a claim would require consideration of *eight additional factors* focused on protecting the expectations of

third-party creditors and investors. *See Manichaean Capital, LLC v. Exela Tech., Inc.*, 251 A.3d 694, 715 (Del Ch. 2021).

Plaintiff's "fraud" claim thus boils down to an allegation that Mr. Bryant misrepresented the nature of the relationship between GridKor and KorDev in a way which she does not even know was harmful and that (if true) would have made it even harder for her to pierce the corporate veil, and she somehow relied on that misrepresentation to her detriment even though the true facts actually make holding the non-contracting entity somewhat less burdensome that it would be had the alleged statements been true. Plaintiff's whole theory of fraud, at least as it relates to the corporate form, makes no sense and is not plausible.

Plaintiff, however, insists an alter ego claim is necessary to prevent an injustice, arguing because "Bryant made multiple misrepresentations on behalf of himself and his various corporate entities, using them to fraudulently induce Urben to enter into the SPA … Bryant must be personally liable for such injustice." (Opp'n at 11-12.) If *Mr. Bryant himself* made false, actionable statements, on which Plaintiff reasonably relied to her detriment, then he can be held personally liable. But such does not make out an alter ego theory, foisting on Mr. Bryant liability for the contractual or tort obligations and duties of GridKor. Because Plaintiff does not allege that Defendants' "use of the corporate form itself" was the source of any fraud or injustice against her, Plaintiff does not adequately plead that GridKor, KorDev, or the Bryants were alter egos of one another. *See Zweigenhaft v. PharMerica Corp.*, No. CV 19-2201-RGA, 2020 WL 5258345, at *2 (D. Del. Sept. 3, 2020). Whatever she might allege against GridKor or Mr. Bryant personally, Plaintiff cannot make out an alter ego or veil-piercing theory.

11

## II.      No Case Law Supports Plaintiff's Attempt to Allege Alter Ego Claims in Conclusory Fashion

No authority, not even the cases Plaintiff herself relies on, support her arguments. Citing *In re Buckhead Am. Corp.*, 178 B.R. 956 (D. Del. 1994), Plaintiff mischaracterizes Movant's argument as "appear[ing] to point toward whether or not Urben will be able to *prove* alter ego liability, not whether or not such liability has been pled." (Opp'n at 9-10 (emphasis in original).) Plaintiff undoubtedly will not be able to prove any alter ego theory, but to even be permitted to take discovery and attempt to prove such a theory she must first plead a plausible claim and do so in accordance with Rule 9(b). Plaintiff has not done so.

In *Buckhead*, by contrast, the plaintiffs (a Chapter 11 debtors' creditors committee) alleged in great specificity the manner by which the defendants caused the debtor company to "go private" in a pair of leveraged buyout transactions in which a wholly-owned subsidiary financed the purchase of large amounts of the parent's stock without the subsidiary receiving any consideration in exchange and leaving the parent insolvent and undercapitalized. *See* 178 B.R. at 959-63. The plaintiffs challenged both LBOs as fraudulent conveyances, but also claimed the particular details of the transactions and defendants' roles in them gave rise to alter ego claims against those persons and entities. The defendants sought to dismiss the alter ego claims not because the claims were not pled with particularity (actually, they *conceded* the plaintiffs' extensive allegations would support piercing the corporate veil), but instead argued that because they did not directly own shares in the parent but instead exercised dominion and control over the parent (and ultimately the debtor) through various corporate intermediaries, they were insulated from alter ego liability. Movants, however, are not alleging that some complex business structure insulates them from liability and requires dismissal of an otherwise well-pled veil piercing claim. Movants seek

dismissal because Plaintiff has not alleged either a plausible, much less a particularized, alter ego claim in the first place.

Plaintiff also cites *Pontiaki Special Maritime Enter. v. Taleveras Grp.*, Civ. No. 16-247-LPS, 2016 WL 4497058 (D. Del. Aug. 26, 2016), but in that case the plaintiff alleged, among other things, the particulars of winding up and liquidation proceedings that left the debtors insolvent and grossly undercapitalized, the debtors' failure to pay multiple other outstanding judgments, the efforts by which the defendants deliberately "tanked" the debtors to avoid paying those judgments, the debtors' re-domiciling moves to evade insolvency proceedings and their creditors, the defendants' transfer of business and customers from the debtors to another entity controlled by them without consideration, the lack of functioning officers and directors (one corporate resolution purportedly was signed by a deceased person), and the movement of funds through one of the debtor's bank accounts even after it supposedly had ceased functioning. *Id.* at *3-6. Plaintiff does not make any remotely similar allegations here.

Plaintiff also cites *CLP Toxicology, Inc. v. Casla Bio Holdings*, LLC, No. 2018-0783-PRW, 2020 WL 3564622 (Del. Ch. June 29, 2020). In that case *the buyer* in a stock sale transaction brought alter ego claims against the holders of 69 percent of the equity in one of the two sellers, alleging, among other things, that they "ignored all corporate formalities" and used the seller entity "as a risk-free investment vehicle," backing that up with lengthy allegations regarding how they inflated the price of the company they sold to the plaintiff and then immediately decapitalized the seller entity, transferring "essentially all of [its] assets to themselves, knowingly leaving [it] unable to pay a judgment …." *Id.* at *23. Plaintiff has not alleged anything of this sort.

Finally, Plaintiff relies upon Judge O'Grady's decision in *Finney v. Clark Realty Capital, LLC*, 2020 WL 6948181 (E.D. Va. Aug. 6, 2020). In *Finney*, the plaintiff (an Army gunnery

13

sergeant) brought a personal injury action for injuries suffered from damp indoor space and mold exposure in his rental military housing unit. *See id.* at *1-3. Among the plaintiff's claims were alter ego theories against two companies (Clark and CRC) that were separate and distinct legal entities from his landlord and property manager, but which the plaintiff alleged effectively controlled the landlord entity. Judge O'Grady's opinion denying the defendants' motion to dismiss did not describe the specifics of the allegations. *See id.* at *5, but a review of the docket shows that the plaintiff had included in his 61-page complaint a series of allegations detailing how, since 2001, Clark had bid for and won 31 contracts to develop and manage military housing across the country utilizing a common structure of interrelated companies, arrangements that had been the subject of at least three prior lawsuits and judicial decisions demonstrating the precise manner by which Clark operated all 31 projects directly and through a common scheme. *See Finney v. Clark Realty Capital, LLC, et al.*, No. 1:20-cv-00093-RDA-IDD, Doc. 37 ¶¶ 24-37. Plaintiff, of course, alleges nothing like this.

Each of the cases on which Plaintiff relies, therefore, involved far more detailed, extensive and particularized allegations than Plaintiff has presented in this case, either in her original Complaint or the First Amended Complaint. None of those plaintiffs rested entirely on conclusory allegations, as Plaintiff does here. Plaintiff has not cited, and cannot cite, any case allowing an alter ego or veil piercing claim to proceed beyond the pleading stage based on allegations so threadbare and conclusory as her own.

Moreover, Plaintiff fails to distinguish, or outright ignores, the authority cited by Plaintiff. Plaintiff attempts to distinguish *SEC v. Woolf*, 835 F. Supp. 2d 111 (E.D. Va. 2011), by characterizing Judge Lee's decision in that case as turning on the plaintiff's failure to "expressly plead" that the corporate defendants and their presidents "were united by interest and ownership"

14

or that "the observance of the corporate form [in this case] would sanction a fraud, promote injustice, or [result in an injustice]." (*See* Opp'n at 12.)  According to Plaintiff, her claims are different because she does allege those things. (*Id.*)  But this completely misstates the substance of the *Woolf* opinion.  The SEC's shortcoming in that case was not that it had failed to make conclusory allegations like Plaintiff has; the SEC had made exactly such allegations.  The problem was the SEC *had failed to allege specific facts to back up its conclusory allegations* as to either required component of a veil piercing claim.  See 835 F. Supp. 2d at 124-25.  Plaintiff's First Amended Complaint suffers from the same deficiency.

Plaintiff makes no attempt to distinguish the other case discussed at length in Movants' opening brief, *Doberstein v. G-P Indus., Inc.*, No. CV 9995-VCP, 2015 WL 6606484 (Del. Ch. Oct. 30, 2015) (*see* Doc. 23 at 6-7).  Plaintiff never even mentions this case, which is particularly damning in that the tenor of the allegations in *Doberstein* are similar to what Plaintiff alleges here.  In *Doberstein*, the plaintiff alleged the defendant-company's president "repeatedly communicated false statements to [plaintiff] concerning the work being done" and that he "increased the frequency and the amount of [the company's] billing during the last six weeks of the Project, despite the fact that they knew they shortly were going to abandon it and cease doing business," thus deliberately extracting as much money as possible from the plaintiff with no intention of completing the work. *Id.* at *4-5.  The court noted these allegations "may or may not support a claim for fraud," but it dismissed the veil-piercing claims against the company's president because plaintiff had failed to allege facts that created any nexus between the alleged fraud and some manipulation or abuse of the corporate form. *Id.* at *4.  Plaintiff cannot explain why her First Amended Complaint is any different, and she does not even attempt to do so.

### III.     Plaintiff Cannot Use Discovery to Make Out Her Alter Ego Claims

Plaintiff's own arguments and allegations make clear that she lacks any basis to bring alter ego claims. In an affidavit, Plaintiff herself admits she does not know (and thus has no basis for alleging) whether Mr. Bryant's sworn statements (*see* Doc. 24) are true or not, but instead hopes to "pursue discovery to determine the truth or falsity" of Mr. Bryant's statements and the business structure, activities, capitalization, solvency, corporate formalities, ownership and control of GridKor and KorDev. (*See* Doc. 34-1 ¶¶ 7 & 9.)

It is well settled that a lawsuit is not a fishing expedition; a plaintiff must first make sufficient allegations to state a claim before seeking to utilize the discovery process to attempt to prove those claims. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 ("Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *McGee v. Hayes*, 43 Fed. App'x 214, 217 (10th Cir. 2002) ("The district court was not required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim."); *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim ...."); *Anderson v. Boston Scientific Corp.*, No. 1:12-CV-00762, 2013 WL 632379, at *3 (S.D. Ohio Feb. 20, 2013) (remarking that "discovery cannot be used as a fishing expedition to uncover the facts necessary to support the causes of action presented in the complaint"); *Sovereign Bonds Exchange LLC v. Fed. Republic of Germany*, No. 10-21944-CIV, 2011 WL 13100214, at *2 (S.D. Fl. Aug. 9, 2011) ("Parties may not file insufficient complaints with the hope of receiving discovery to make them sufficient."); *Top v. Ocean Petroleum, LLC*, Civil No. 10-1042, 2010 WL 3087385, at *4 (D.N.J. Aug. 3, 2010) ("Until

Plaintiff is able to allege enough facts to make a claim plausible, the Court will not impose the burdens of discovery upon Defendant.").

If Plaintiff cannot plead her alter ego claims with the requisite particularity (and she has now twice demonstrated she cannot), the Court should not permit her to take wide-ranging discovery in an attempt to find some basis on which she thinks she can allege such claims.

## IV.    Plaintiff States No Claim of any Kind Against Alyssa Bryant

In support of their Motion, Movants noted that Alyssa Bryant, Michael Bryant's wife, is not an owner of any of the entities at issue and pointed out that the First Amended Complaint *does not allege she did anything at all* until December 8, 2022,[3] a full month *after* Plaintiff executed the Stock Purchase Agreement into which she alleges Mrs. Bryant fraudulently induced her to enter.  (Doc. 23 at 13-14.)

In her Opposition, Plaintiff makes no attempt to defend her purported claims against Mrs. Bryant or to manufacture any possible argument for personal liability on the part of Mrs. Bryant. Plaintiff does not even acknowledge this section of Movants' Motion.  The claims against Mrs. Bryant must be dismissed.

## CONCLUSION

For all of the reasons set forth above and in Movant's opening Memorandum, the Court should (a) dismiss with prejudice all claims asserted against the Bryants and KorDev on the basis of an alter ego theory of liability, and (b) dismiss with prejudice the First Amended Complaint in its entirety as to Mrs. Bryant.

---

[3] In fact, the First Amended Complaint never even alleges Mrs. Bryant *said anything*, on December 8, 2022 or at any other time, much less that she said anything that was materially false.

DATE:  May 2, 2023	Respectfully submitted,

*/s/ Tillman Finley*
Tillman J. Finley (VSB No. 93284)
tfinley@marinofinley.com
MARINO FINLEY LLP
818 Connecticut Avenue, N.W., Suite 801
Washington, DC  20006
Tel:  202.223.8888

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2023, I filed the foregoing REPLY IN SUPPORT OF KORDEV LLC, MICHAEL BRYANT, AND ALYSSA S. BRYANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT using the Court's CM/ECF system, which will send a notice of electronic filing to all parties of record.

*/s/ Tillman J. Finley*
Tillman J. Finley