# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| AVONDA URBEN, on behalf of herself and in her capacity as the Sellers' Representative, | )<br>)<br>) |
| Plaintiff, | ) Case No. 1:23-cv-00138-TSE-IDD |
| v. | ) |
| GRIDKOR, LLC, MICHAEL BRYANT, KORDEV, LLC, and ALYSSA SCHRECENGOST BRYANT, | )<br>)<br>) |
| Defendants. | ) |
| GRIDKOR, LLC, | ) |
| Counterclaim and Third-Party Plaintiff, | ) |
| v. | ) |
| AVONDA URBEN; JOHN DOE NOS. 1-5; and JANE DOE NOS. 1-5, | )<br>) |
| Counterclaim and/or Third-Party Defendants | ) |

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS AMENDED COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

Plaintiff / Counterclaim Defendant Avonda Urben's Motion to Dismiss Amended Counterclaims and Third-Party Claims (Doc. 32) should be denied. Ms. Urben seeks to assert claims against GridKor for failing to operate and grow the company she purported to sell to GridKor, The Perfect V Enterprises, Inc. ("PVE") (*see* Doc. 15), despite that she has failed (in the face of repeated requests and demands) to perform the most fundamental prerequisite to GridKor's ability to do so—actually transferring control of PVE to GridKor. GridKor cannot very well

operate that which it does not control, yet Plaintiff insists that the Stock Purchase Agreement by which she purported to sell PVE to GridKor somehow did not require her "to transfer or deliver [the] assets, accounts, or property of PVE to GridKor" (Doc. 33 at 3). Plaintiff would have it that she can force GridKor to operate PVE without giving GridKor control of any of the things GridKor would need to operate PVE, or any company. Plaintiff thus has breached the seller's most fundamental of obligations under any Stock Purchase Agreement, *i.e.*, transferring control of the company to the buyer. Plaintiff's argument that neither the Stock Purchase Agreement nor the implied covenant of good faith and fair dealing required her to do this is a repudiation of the very point of the agreement, and finds no basis in law or the agreement.

Further, as detailed in the Amended Counterclaim and Third-Party Complaint, in the discussions and exchanges of information leading up to the execution of the Stock Purchase Agreement, Plaintiff misrepresented PVE's inventory position (overstating the amount that existed by nearly 20 percent and failing to disclose that *no inventory* was actually available and ready to be shipped), disclosed only a third of its creditors and understated its liabilities by nearly 40 percent, and falsely characterized the product as physician-endorsed. Plaintiff contends these claims are not pled with sufficient particularity, but the Amended Counterclaim and Third-Party Complaint provides more than sufficient detail to set out the who (Plaintiff), what (inventory, liabilities, and endorsement), the how and when (in specific emails and spreadsheets in August 2022, repeatedly confirmed in meetings and discussions thereafter) of the false statements that induced GridKor to enter into the Stock Purchase Agreement under which Plaintiff never performed. Plaintiff's speculation that her statements and the reality discovered by GridKor in November 2022 could, in some fashion, both be true is just that, speculation, and at most a factual defense to the claims—not a basis for dismissing the claims altogether at the pleading stage.

For all of these reasons, and those set forth in more detail below, the Court should deny Plaintiff's Motion.

## ARGUMENT

**I.     GridKor Has Stated a Claim for Breach of Contract**

Ms. Urben seeks to dismiss "those portions of Count I and II, for breach of contract and breach of the implied covenant of good faith and fair dealing, respectively, which purport to rely on non-existent contractual obligations and vague allegations which cannot be plausibly read into the contract to impose an obligation upon Plaintiff." (Doc. 32 at 1-2.)  Ms. Urben does not challenge all of the asserted breaches of contract, but only those alleged breaches "based on failure to deliver assets." (*See* Doc. 33 at 6.)  According to Ms. Urben, "[n]o matter how denominated, Count I and II fail to state a claim with respect to those branches of the claims alleging that Urben and Sellers failed to transfer and/or deliver all assets, accounts, and property of PVE." (*Id.* at 6-7.)  GridKor alleges that Ms. Urben and the Sellers failed not only to deliver any actual stock, but "failed to deliver access to and control of the Company's assets, records, bank accounts, email accounts, vendor portals, website, systems, and even basic identifying information." (Doc. 26, Amended Counterclaim ¶ 2.)  GridKor alleges this failure breached both the Agreement itself (Count I) and the implied covenant of good faith and fair dealing (Count II). (*See* Doc. 26, Amended Counterclaim ¶¶ 36(c) & 43.)

Ms. Urben, however, boldly claims that despite her and the Sellers' agreement to sell their entire interest in the company to GridKor, "no provision in the SPA requires Urben or the Sellers to 'transfer and/or deliver' any Company assets, accounts or property" and that "there is no 'contractual obligation' for Urben or the Sellers to deliver Company assets[.]" (Doc. 33 at 7.) According to Ms. Urben, she can sell PVE to GridKor *but keep all of the property belonging to PVE*.  This is complete nonsense.  By definition, a sale of stock transfers control of the assets of

3

the company whose stock is transferred. While ownership of the assets remains with the company, control over those assets transfers to the buyer acquiring the stock of the company. *See, e.g.*, "Building a Future: Succession Planning for Contractors," Construction Accounting and Taxation, 2017 WL 6343881 ("*Stock sales* are preferred when the entire company is the object of desire. With a stock sale, the previous owners relinquish all rights to the company, including all assets and liabilities. This type of sale is preferred when the goal is for the new owner to take control with little business disruption."); Complex Corporate Transactions, AHLA-PAPERS P11199804 (Nov. 19, 1998) ("In a stock purchase, Buyer indirectly acquires all assets and liabilities of Target, including unknown contingent liabilities, when it purchases Target's stock.").

Ms. Urben does not, and cannot, dispute that the Agreement required her and Sellers to transfer their "ownership interest in the Business Entity," that is "100% of all issued and outstanding shares of stock of the Business Entity," to GridKor. (Doc. 15-1 §§ II & III.) Ms. Urben and Sellers breached that obligation not only by failing to deliver any actual stock or stock certificates, but by denying GridKor access to and control of the entity that was supposed to be transferred. Even if Ms. Urben had delivered the stock, those pieces of paper would be meaningless if devoid of the rights that are part and parcel of the legal ownership they purport to represent. It defies basic hornbook law that a seller could sell all of the stock of a company, yet keep for herself all of the items of physical and intangible property that constitute the assets of the company and the records, materials, information, and systems required to continue the operation of the company.

Contrary to Plaintiff's view, a seller who fails to transfer access to and control of the company's assets to the buyer fails to perform the most basic purpose of a stock purchase

agreement, *i.e.*, to transfer the company to the buyer. Ms. Urben has breached the Agreement in this most basic and fundamental way.

## II. GridKor Has Stated a Claim Breach of the Implied Covenant of Good Faith and Fair Dealing

Even if the obligation to transfer access to and control of the assets of PVE were not part and parcel of Ms. Urben and Sellers' contractual obligation to transfer the company to GridKor, Ms. Urben and Sellers' failure to do so violates the implied covenant of good faith and fair dealing.

The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement. The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions. "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). "The implied covenant is inherent in all contracts" and it is "well-suited to imply contractual terms that are .. obvious[.]" *Dieckman v. Regency GP LP*, 155 A.3d 358, 361, 367 (Del. 2017). "The court's goal is to preserve the economic expectations of the parties." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

The clear contemplation (and, indeed, the entire purpose) of the Agreement was for GridKor to take over the business, to take control of it and all of its assets, and to operate it going forward. In addition to providing that Sellers were to transfer the entirety of their "ownership interest in the Business Entity," in exchange for $1.00, the Agreement called for GridKor to take on the obligations to pay a royalty up to a certain point per unit sold by the Business Entity; to prepare and timely file tax returns; to become the authorized signatory on the Business Entity's

bank accounts; to "keep complete, accurate and relevant records (and supporting documentation, including without limitation invoices) of all completed sales, including prices and discounts"; "to use its reasonable best efforts to effectively market and promote the inventory and Units of the Company"; to not sell or transfer the "the Business Entity's intellectual property rights"; to maintain such rights; "[t]o use its reasonable best efforts to ensure that" such rights" are used as intended and with a view to further the Business Entity's business and increase the Business Entity's sales"; and to "indemnify and hold harmless each Seller from any obligations, liabilities, or debts of the Business Entity." (Doc. 15-1 §§ II, III, XIII(a), (b), (e), (f), (h), (m).) As Plaintiff has herself alleged, "the consideration for permitting GridKor to finance the purchase out of future royalties to be paid to the Sellers' Representative was that the Buyer must *in fact operate and grow the Company* …." (Doc. 15 ¶ 58 (emphasis added).) How did Ms. Urben expect GridKor to operate and grow the business, sell its product, use its property, file its tax returns, and keep its records without having access to or use of the company's property, records, and information? At a fundamental level, to operate and grow the business GridKor necessarily had to have access to and control of the business.

Further, under Section XIII(g)'s "Acceleration of Royalty" provision, one of the specifically-identified events that may trigger the acceleration is if "[t]he Business Entity sells, assigns, licenses, or transfers or substantially all of its assets without the prior written consent from the Sellers' Representative." *First*, this provision presupposes that the business has assets. *Second*, GridKor could not very well sell, assign, license, or transfer any assets of PVE, much less "substantially all of its assets," if it never gained access to or control of those assets in the first place.

GridKor is not, as Ms. Urben claims, asking the Court "to create additional wide-ranging obligations out of whole cloth." (Doc. 33 at 9.) Quite to the contrary, GridKor is asking the Court to recognize the fundamental purpose of the Agreement and GridKor's reasonable expectations with respect thereto. Even if the Agreement's express requirement that Ms. Urben and Sellers transfer the entirety of the ownership interest in the PVE to GridKor could somehow be interpreted as not prohibiting Ms. Urben and Sellers from retaining the PVE's assets, records, accounts, and information, the implied covenant is well-suited to fill precisely this kind of obvious gap. *See Dieckman*, 155 A.3d at 361 ("[W]here, as here, the express terms of the partnership agreement naturally imply certain corresponding conditions, unitholders are entitled to have those terms enforced according to the reasonable expectations of the parties to the agreement. The implied covenant is well-suited to imply contractual terms that are so obvious … that the drafter would not have needed to include the conditions as express terms in the agreement."); *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (the implied covenant is invoked to "imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected").

Though to be done cautiously, implying contract terms is an "occasional necessity … to ensure [that] parties' reasonable expectations are fulfilled." *Dunlap*, 878 A.2d at 442. Here, GridKor's reasonable expectations were that it was acquiring PVE and would have control, as 100 percent owner, of PVE and all of its assets. Such would be the reasonable expectations of *any party entering into a stock purchase agreement.* Plaintiff's insistence that she can sell PVE but keep everything that PVE owns for herself undercuts the very essence of the agreement, not to mention GridKor's reasonable expectations. Moreover, deployment of the implied covenant to fill

7

a contractual gap is "fact-intensive, turning on issues of compelling fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). As such, GridKor's claim in Count II is especially inappropriate for a motion under Rule 12(b)(6).

### III. GridKor Has Sufficiently Pled Its Fraudulent Inducement and Negligent Misrepresentation Claims

Ms. Urben also seeks to dismiss Counts III and IV of the Amended Counterclaim based upon alleged lack of particularity. These arguments also lack merit.

Initially, we note that the law of Delaware—not Virginia—applies to GridKor's fraudulent inducement and negligent misrepresentation claims. While it is correct that a federal court sitting in diversity applies the choice of law rules of the forum state, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (citing *Tate v. Hain*, 181 Va. 402, 25 S.E.2d 321, 324 (Va. 1943)). Here, Section XI of the Agreement states that it "shall be construed, interpreted and enforced in accordance with, and shall be governed by, the laws in the State of Delaware without reference to, and regardless of, any applicable choice or conflicts of laws principals." (Doc. 15-1 § XI.)

Where, as here, a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims such as fraudulent inducement, the Fourth Circuit and other courts have honored the intent of the parties to choose the applicable law. *Hitachi Credit*, 166 F.3d at 628 (holding choice of law provision calling "for the application of Virginia law in the interpretation of '[t]his Agreement and the rights and obligations of the parties hereunder ... including all matters of construction, validity and performance'" encompassed claims for fraudulent inducement to enter such agreements). Here, Counts III and IV are both premised upon misrepresentations by

Ms. Urben and/or Sellers which caused GridKor to enter into the Agreement, and which GridKor asserts as grounds for recission. They are, therefore, within the scope of the choice of law provision to which the parties agreed.

As for Ms. Urben's particularity arguments, Counts III and IV do allege with particularity what was represented, when, by whom, in what form, and what was false about the representations. As detailed in the Amended Counterclaim and Third-Party Complaint, on August 2, 2022, Ms. Urben herself emailed Mr. Bryant a spreadsheet stating the Company had on hand inventory valued at $390,419.50 and thereafter repeatedly reiterated in calls and meetings that the Company had $400,000 of inventory on hand and available. (Doc. 26, Amended Counterclaim ¶ 15.) On the same day, Ms. Urben emailed Mr. Bryant another spreadsheet identifying outstanding accounts payable to just five vendors for a total of $43,360. (*Id.* ¶ 16.) Further, in telephone calls in August 2022 and at least one subsequent meeting in September 2022, Ms. Urben personally represented that the Company's product had been approved or endorsed by an independent physician. (*Id.* ¶ 17.)

In November 2022, however, after closing, GridKor learned from agents of the Company and its vendors that the Company had only $333,637 of inventory and even that was frozen due to unpaid bills; it had outstanding accounts payable to 15 creditors totaling nearly $70,000 (300 percent and more than 40 percent, respectively, more than Ms. Urben had represented); and the supposed "independent physician" was a family member or friend of Ms. Urben. (Doc. 26, Amended Counterclaim ¶¶ 23-30.) The Amended Complaint further alleges how GridKor relied upon each of these false representations in negotiating with Ms. Urben and deciding to enter into the Agreement. (*Id.* ¶¶ 12-19.)

9

Plaintiff argues GridKor "fails to allege how the key representations regarding Company finances were false when made" and posits that the disparity in the numbers provided by Plaintiff in August 2022 and those later provided by PVE in November 2022 "are entirely consistent with Urben providing GridKor with two sets of accurate numbers – one set that was accurate as of August 2, 2022, and a second set that was accurate as of November 2022." (Doc. 33 at 12-13.)

*First*, this is a bold argument to make given that Plaintiff has refused to deliver to GridKor any of the company's vendor, accounting, or bookkeeping records or to give GridKor access to any of PVE's historical email communications with vendors and creditors.

*Second*, at the very most, Plaintiff speculates a possible *factual* defense to the alleged falsity of her statements. But a Rule 12(b)(6) motion is neither the time nor the place to litigate such an argument, especially where GridKor has not had the benefit of discovery or even access to PVE's own historical records.

*Third*, all of this ignores that at least one creditor (PVE's warehouse) has advised GridKor of two unpaid invoices from December 2021 and March 2022 that were not included on the reports provided by Plaintiff in August 2022 or the post-closing report in November 2022. (Doc. 26, Amended Counterclaim ¶ 28.)

*Fourth*, this also ignores that the misrepresentations regarding inventory did not relate only to the amount of inventory that existed, but specifically to the amount that was on hand and available when, in fact, it was not available because the warehouse had frozen the inventory and refused to release it to fill orders based upon unpaid invoices dating back to 2021. (*See* Doc. 26, Amended Counterclaim ¶¶ 15, 24-25.)

Plaintiff also argues that GridKor cannot allege that it conducted a "prudent investigation" in order to allege reasonable reliance, pointing to Section VI of the SPA stating that "The Buyer

10

does not require a due diligence period to review the finances and agreements of the Business Entity." (Doc. 33 at 13-14.) But the very case Plaintiff cites, *Hitachi*, makes clear that a general waiver of due diligence or warranties, or covenants disclaiming or limiting liabilities, "is not a prophylactic against a claim of fraud." 166 F.3d at 630. "While … contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a 'false representation of a material fact, constituting an inducement to the contract, on which the purchase had a right to rely, is always ground for rescission of the contract by a court of equity'" or an action for damages in a court of law." *Id.* (quoting *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 111-12 (1979)). Instead, reliance on a false representation is not justified only "where the relying party fails to undertake a prudent investigation *and* specifically disclaims reliance *on that very representation* in a contract." *Id.* (emphasis added). In reliance on Plaintiff's representations and the information she provided, GridKor chose not to pursue further diligence but they did not specifically disclaim reliance on Plaintiff's representations regarding PVE's inventory, its liabilities, or its product's physician-endorsed status.

Further, even if Virginia law were to apply to GridKor's fraudulent inducement and negligent misrepresentation claims, as Ms. Urben urges, GridKor has still alleged the claims with sufficient particularity. "The cases in Virginia are clear [] that 'one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth.'" *Hitachi Credit*, 166 F.3d at 629 (citing *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 631 (1985)). This is what Ms. Urben attempts to do; Ms. Urben cannot now avoid liability by saying GridKor was negligent in failing to learn the truth, when by fraud, Ms. Urben induced GridKor to enter into the Agreement to its disadvantage. *See id*.

GridKor, therefore, has pled its claims with sufficient particularity and Ms. Urben's Motion should be denied.

## CONCLUSION

For the reasons set forth above, GridKor respectfully requests that the Court deny Ms. Urben's Motion to Dismiss. (Doc. 32.)

DATE: May 10, 2023

Respectfully submitted,

/s/ Tillman Finley
Tillman J. Finley (VSB No. 93284)
tfinley@marinofinley.com
MARINO FINLEY LLP
818 Connecticut Avenue, N.W., Suite 801
Washington, DC 20006
Tel: 202.223.8888

*Attorneys for GridKor, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2023, I filed the foregoing using the Court's CM/ECF system, which will send a notice of electronic filing to all parties of record.

*/s/ Tillman J. Finley*
Tillman J. Finley
